# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| KOSS CORPORATION,<br><br>    Plaintiff,<br><br>    v.<br><br>PEAG, LLC d/b/a JLAB AUDIO<br><br>    Defendant. | Case No. 6:20-cv-00662<br><br>**COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, Koss Corporation ("Koss"), files this complaint for patent infringement against PEAG, LLC d/b/a JLab Audio ("JLab" or "Defendant") and in support thereof alleges and avers as follows:

## NATURE OF THE ACTION

1.      This is a civil action arising under the patent laws of the United States, 35 U.S.C. § 1 et seq., including specifically 35 U.S.C. § 271, based on JLab's willful infringement of U.S. Patent Nos. 10,206,025 ("the '025 Patent"), 10,368,155 ("the '155 Patent"), 10,491,982 ("the '982 Patent"), and 10,506,325 ("the '325 Patent") (collectively "the Patents-in-Suit").

## THE PARTIES

2.      Plaintiff Koss Corporation is a corporation existing under the laws of the State of Delaware having its principal place of business located at 4129 North Port Washington Avenue, Milwaukee, Wisconsin 53212.

3.      Koss markets a complete line of high-fidelity headphones and audio accessories. Koss's products, branded under the Koss brand name or private label brands, are sold at various

retail chains throughout the United States and the world, including Walmart stores and other large brick-and-mortar establishments, as well as direct to customers in at least the following cities in this District:  Alpine, Austin, Del Rio, El Paso, Midland, Odessa, San Antonio, and Waco.

4.      Koss also serves as an Original Equipment Manufacturer ("OEM") for a customer in this Judicial District.  In this role, Koss manufactures OEM headphones sold under its customer's brand.

5.      On information and belief, PEAG, LLC d/b/a JLab Audio is a Delaware Corporation with a principal place of business at 2281 Las Palmas Dr., Carlsbad, California 92011 and an established place of business at 17950 Preston Road, Suite 360, Dallas, Texas 75252.  On information and belief, PEAG, LLC d/b/a JLab Audio is registered to do business in the State of Texas and may be served through its registered agent Corporation Services Company dba CSC Lawyers Inco, 211 E. 7th St., Suite 620, Austin, Texas 78701.

6.      On information and belief, JLab has transacted business in this district and has committed acts of direct and indirect infringement in this District by, among other things, importing, offering to sell, and selling products that infringe the asserted patents to businesses in this district including, but not limited to Target, Best Buy, Kohl's, Verizon, Office Depot, Office Max, Wal-Mart, Academy Sports, and Dick's Sporting Goods stores located in, *inter alia*, El Paso, Austin, San Antonio, and other cities within this district.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the claims herein arise under the patent laws of the United States, 35 U.S.C. § 1 et seq., including 35 U.S.C. § 271.

8.      This Court has personal jurisdiction over JLab in this action because JLab has committed acts of infringement within the State of Texas and within this District through, for example, the sale of JLab headphones both online and from the retail locations of its partners in

-2-

this District.  JLab regularly transacts business in the State of Texas and within this District. JLab engages in other persistent courses of conduct and derives substantial revenue from products and/or services provided in this District and in Texas, and has purposefully established substantial, systematic, and continuous contacts within this District and should reasonably expect to be sued in a court in this District.  For example, JLab has offices and a registered agent for service in Texas. JLab operates a website and various advertising campaigns that solicit sales of the infringing products by consumers in this District and in Texas.  JLab has entered into partnerships with numerous resellers and distributors to sell and offer for sale the Accused Products to consumers in this District, both online and in stores, and offers support service to customers in this District. Given these contacts, the Court's exercise of jurisdiction over JLab will not offend traditional notions of fair play and substantial justice

9.     Venue in the Western District of Texas is proper pursuant to 28 U.S.C. §§ 1391(b), (c) and 1400(b).

10.     On information and belief, JLab has transacted business in this  judicial district and has committed acts of direct and indirect infringement in this judicial District by, among other things, importing, offering to sell, and selling products that infringe the asserted patents to businesses in this district including, but not limited to Target, Best Buy, Kohl's, Verizon, Office Depot, Office Max, Wal-Mart, Academy Sports, and Dick's Sporting Goods stores located in, inter alia, El Paso, Austin, San Antonio, and other cities within this district, and providing support service to JLab's customers in this District.

## KOSS'S LEGACY OF AUDIO INNOVATION

11.     Koss was founded in 1953 as a television rental company in Milwaukee, Wisconsin.

12.     In 1958, John C. Koss invented the world's first SP/3 Stereophone as part of a "private listening system" that would enable the wearer to listen to a phonograph without disturbing others in the vicinity:



13.     The SP/3 Stereophone provided, for the first time, a high-quality stereophonic headphone that approximated the sounds of a concert hall.

14.     John C. Koss demonstrated the SP/3 Stereophone at a Wisconsin audio show in 1958.  Initially designed to demonstrate the high-fidelity stereo sound that a portable phonograph player delivered, these revolutionary SP/3 Stereophones became the hit of the show.

15.     The SP/3 Stereophone has since been enshrined in the Smithsonian Museum's collection in Washington, DC, with John C. Koss delivering the SP/3 for enshrinement along with an explanation of the story of the SP/3 in 1972:



16.     Koss's commitment to headphone development continued into the 1960s and beyond.  In 1962, Koss developed and brought to market the PRO/4 Stereophone, which was bestowed with Consumer Union Magazine's #1 choice award in 1963:



17.     Due to the success and quality of the Pro/4, the United States government awarded Koss with a contract to install fifty (50) Pro/4 units in the staff, press, and presidential quarters of Air Force One.  Passengers accessing the aircraft's state-of-the-art entertainment system listened to the system using the Pro/4:



18.     In 1970, Koss moved its World Headquarters to the current location at 4129 North Port Washington Ave., Milwaukee, Wisconsin:



19.     Also in 1970, Koss set the standard for full-size professional headphones with its Pro/4AA:



20.     At the time of introduction, the Pro/4AA were regarded as the first dynamic headphones to deliver true full frequency and high-fidelity performance with noise-isolating capabilities.

503322546 v4

21.     Koss continued improving its Stereophone product line throughout the 1970s and into the 1980s.  In 1984, Koss introduced the Porta Pro, an acclaimed product that set performance and comfort standards for on-the-go listening:



22.     The Porta Pro continues to be one of the most popular headphone products around the world, particularly because of its exceptional audio fidelity and performance capabilities.  In fact, as recently as 2008, CNET awarded the Porta Pros a four-star rating of 8.3 (out of 10), with a performance score of 9 (out of 10), stating that "there's no denying the sound quality here: they're the ideal companion for mobile audiophiles and home theater enthusiasts." (https://www.cnet.com/reviews/koss-portapro-with-case-review/).

23.     In 1965, Koss introduced the award-winning speaker, the Acoustech X, which was heralded as a breakthrough product by Billboard Magazine, touting its concert hall quality and ability to accurately amplify an acoustic guitar to large concert halls.  *Acoustic System Succeeds In Classical Guitar Concert*, BILLBOARD, May 27, 1967, at 71.

24.     Following on Acoustech X, Koss went on to develop a number of additional products:  the world's first computer maximized loudspeaker in 1976; the Kossfire speaker line in the 1980s; the dynamic audio/video Dynamite bookshelf series speaker line; a line of portable/desktop computer speakers that employed a unique magnetic shield to protect nearby computer video and data equipment; and an amplified portable loudspeaker, the M/100, in early 1987.

25.     In 1987, Koss pioneered one of the earliest completely wireless infrared speaker systems:  the JCK 5000.  In 1986, Koss also unveiled a portable speaker, the KSC/50, which was utilized by thousands of members of the United States military during the Gulf War in 1990. Related to the KSC/50, Koss's KSC/5000 included a built-in amplifier.  Those products were profiled in a Newsweek feature on October 12, 1987:





BUCK MILLER

*A little light music: Michael Koss (left) and father John with new cordless speakers*

# Koss Corp.'s Audio Advantage

## A Midwestern firm innovates in stereo

26.     Over the following years, Koss continued to expand its portable speaker offerings, including by expanding into speakerphones for teleconferencing systems with the Speakeasy line, followed by various additional wireless models for portable use.

27.     Elite musicians including Tony Bennett, Les Brown, and Frank Sinatra Jr., have used Koss headphones, including the Pro/4, while recording and/or performing.  Koss's official spokespeople have included music legends Mel "the Velvet Fog" Tormé and Doc Severinsen, the trumpet-playing bandleader for Johnny Carson's Tonight Show band.

28.     In 1979, John C. Koss was inducted into the Audio Hall of Fame.

29.     In 2000, John C. Koss was inducted into the inaugural class of the Consumer Electronics Hall of Fame.

503322546 v4

30.     In 2004, John C. Koss was inducted into the Wisconsin Business Hall of Fame.

### KOSS DEVELOPS THE FIRST EVER TRUE WIRELESS HEADPHONES

31.     Continuing its culture of innovation in high-fidelity audio equipment, in the early 2000s, Koss began developing what became known as the "Striva" project.  The vision for the Striva project was borne out of Koss's recognition that wireless headphones were going to be an integral part of peoples' audio consumption.  In particular, Koss recognized that as radios were needing less power and as batteries and other power sources became smaller and more efficient, people would eventually consume audio content through headphones wirelessly connected to some kind of a source, be it a handheld computing device or in the cloud.

32.     In the early 2000s, Koss began making substantial monetary investments in the Striva project, with the goal of bringing "True Wireless" listening to its loyal customers as the next in a long series of headphone innovations.

33.     Koss recognized that the future was a wireless world, complete with mobile internet connectivity that went beyond traditional hardwired, or computer-based, network topologies.  It recognized that wireless ubiquity was coming, and would extend to wearable devices, including Koss's area of expertise:  the headphone.

34.     With these recognitions in mind, Koss made a substantial commitment to investing in what it saw as the future of headphone technology.  This work eventually became the Striva project, and over the course of its work, Koss invested tens of millions of dollars developing chips, fabrication techniques, prototype headphones, and other related technology to bring the Striva vision to life.

35.     In particular, Koss's work on Striva resulted in the development of a system-on-chip smaller than a human fingertip that could provide audio and wireless communications processing on a low power budget for incorporation into headphones of various form factors:

503322546 v4



36.     Koss's work to develop Striva also predicted some of the interactions that modern headphone users take for granted today.  In particular, Koss recognized early on that the inclusion of a microphone (with appropriate voice recognition software and circuitry) could provide a convenient, hands-free way to interact with wireless headphones.  Koss developed technology that could react to such voice prompts, and in fact implemented prototypes that reacted to users saying "Striva" into a headphone-mounted microphone to begin a voice-based interaction to, for example, switch tracks or adjust headphone volume.

37.     Koss also recognized a headphone concept that users today take for granted: different headphones for different applications.  In particular, as part of the Striva project, Koss developed different form factors with different performance capabilities depending on anticipated use.  Over-ear headphones provided users with higher-quality sound, ambient noise dampening capabilities, and better battery life (due to additional battery real estate), while in-ear headphones provided portability and capability in a smaller, less-intrusive package.

38.     Koss developed prototype in-ear headphones that relied on its chip development efforts, with working prototypes from the mid-2000s looking very much like commonly-known consumer products that flood the market a decade-and-a-half later:

503322546 v4

  

39.     In 2012, Koss introduced Wi-Fi-enabled headphones, the result of its Striva project, which BizTimes hailed as the first wireless headphones to use Wi-Fi transmission and credited Koss with "introducing personal listening to the Internet."  (https://biztimes.com/koss-creates-wireless-headphones-for-wi-fi-music-access/).

40.     In April 2012, Koss brought to market both an in-ear and over-ear embodiment of the Striva vision, with the Striva Pro model being the first true Wi-Fi over the ear headphones (and mirroring many features and aesthetics modern-day users expect in wireless, over-ear headphones):



41.     The Striva Tap, a smaller, in-ear version of the Striva Pro Wi-Fi headphone, provided users with some of the features that modern-day consumers take for granted in in-ear

headphones, like independent wireless earphones with touch gestures to control listening preferences by manipulating the surface of the headphones:



42. Koss also developed (though ultimately did not market) a smart speaker that incorporated many of the Striva features, albeit in a non-wearable form factor. The Striva-based speaker product had a capacitive touch interface to mimic the features of the Striva headphones, and also included a microphone for voice control. In addition, the Striva-based speaker had the capability to be included in a distributed network as part of a precursor to the presently understood Internet of Things, such that the input devices (e.g., the microphone) could be used to control other items in the distributed network (e.g., light switches). The speaker therefore allowed, for example, a user to say "Striva, turn on the lights," and the lights would turn on.

43. The Striva-based speaker product, referred to as the LS2, exists as a working prototype:

503322546 v4



44.     Unfortunately, the economic reality of Koss's market position did not permit it to bring its Striva-based product vision to the masses.  In particular, due to events abroad (and Koss's reliance on sales into those foreign countries), Koss's supply chain and customer base were thrown into upheaval in the late-2000's and early-2010's.

45.     Moreover, Koss conducted market research during the mid-2000's, and concluded that given the market that was likely to develop for wireless headphones, larger companies with more manufacturing capability would become a substantial threat to bringing Striva fully to market.  As a result, Koss invested substantially on part-purchasing, machinery, fabrication, and the like.

46.     The circumstances above, and other circumstances outside of Koss's control, meant that the advanced features first developed for Striva were not able to be fully experienced by the majority of the purchasing public.

47.     Koss brings the instant lawsuit because the industry has caught up to Koss's early-2000s vision:  the technology Koss developed as part of its substantial Striva investment has become standardized, with whole listening ecosystems having been built around the techniques Koss conceived of over a decade ago.

48.     More fundamentally, Koss is responsible for creating an entire headphone industry beginning from its release of the pioneering Stereophone as a ubiquitous way to consume information in 1958.  JLab and others are reaping enormous benefits due to John C. Koss's vision, and Koss Corporation's commitment to that vision, for more than six decades.

## THE PATENTS-IN-SUIT

49.     On February 12, 2019, U.S. Patent No. 10,206,025, entitled "System with Wireless Earphones," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '025 Patent is attached hereto as Exhibit A.

50.     On July 30, 2019, U.S. Patent No. 10,368,155, entitled "System with Wireless Earphones," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '155 Patent is attached hereto as Exhibit B.

51.     On November 26, 2019, U.S. Patent No. 10,491,982, entitled "System with Wireless Earphones," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '982 Patent is attached hereto as Exhibit C.

52.     On December 10, 2019, U.S. Patent No. 10,506,325, entitled "System with Wireless Earphones," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '325 Patent is attached hereto as Exhibit D.

53.     The Patents-in-Suit represent Koss's significant investment into the wireless headphone and wearable technology space, including its commitment in the form of decades of research and millions of dollars.

## DEFENDANT'S KNOWLEDGE OF THE PATENTS-IN-SUIT

54.     On July 13, 2020, Defendant was notified of its infringement by way of the letter attached hereto as Exhibit I.

## FIRST CAUSE OF ACTION

### (Infringement of the '025 Patent)

55.     Koss incorporates by reference and realleges each and every allegation of Paragraphs 1 through 54 as if set forth herein.

56.     Koss owns all substantial rights, interest, and title in and to the '025 Patent, including the sole and exclusive right to prosecute this action and enforce the '025 Patent against infringers, and to collect damages for all relevant times.

57.     The '025 Patent generally describes wireless earphones that comprise a transceiver circuit for receiving streaming audio from a data source, such as a digital audio player or a computer, over a wireless network.

58.     The written description of the '025 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

59.     JLab has made, had made, used, imported, supplied, distributed, sold, and/or offered for sale products and/or systems, including systems in which its JLab-branded products and/or systems, including the Air Executive headphones, are incorporated ("Accused Headphones").

60.     As set forth in the attached non-limiting Claim chart (Exhibit E), JLab has infringed and is infringing at least Claim 1 of the '025 Patent by making, having made, using, importing, distributing, selling, and/or offering for sale the Accused Headphones.  In particular, the use of the Accused Headphones by JLab to, for example, demonstrate those products in brick-and-mortar stores in Austin, Texas or to, for example, test those products, constitute acts of direct infringement of Claim 1 of the '025 Patent.

61.     JLab actively induces infringement of at least Claim 1 of the '025 Patent by selling the Accused Headphones with instructions as to how to use the Accused Headphones in a system

such as that recited in the '025 Patent.  JLab aids, instructs, or otherwise acts with the intent to cause an end user to use the Accused Headphones.  JLab knew of the '025 Patent and knew that its use and sale of the Accused Headphones infringe at least Claim 1 of the '025 Patent.

62.     JLab is also liable for contributory infringement of at least Claim 1 of the '025 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Accused Headphones, used to infringe Claim 1 of the '025 Patent. The Accused Headphones have no substantial non-infringing uses. When an end user uses the Accused Headphones in combination with, for example, a smart phone such as, for example, an Apple iPhone and/or a periphery device, such as, for example, an Apple Watch, the end user directly infringes Claim 1 of the '025 Patent.  JLab knew that the Accused Headphones were especially made for use in an infringing manner prior to the filing of this lawsuit.  For at least the reasons set forth above, JLab contributes to the infringement of the '025 Patent by others.

63.     Koss has been damaged as a result of the infringing conduct by JLab alleged above. Thus, JLab is liable to Koss in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

64.     JLab's infringement of the '025 Patent has caused, and will continue to cause, Koss to suffer substantial and irreparable harm.

65.     JLab has been aware that it infringes the '025 Patent since at least July 13, 2020, upon the receipt of the letter attached as Exhibit I.  Since obtaining knowledge of its infringing activities, JLab has failed to cease its infringing activities.

66.     JLab's infringement of the '025 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Koss's rights under the patent.

67.     Koss has complied with 35 U.S.C. § 287 with respect to the '025 Patent.

**SECOND CAUSE OF ACTION**

**(Infringement of the '155 Patent)**

68.     Koss incorporates by reference and realleges each and every allegation of Paragraphs 1 through 67 as if set forth herein.

69.     Koss owns all substantial rights, interest, and title in and to the '155 Patent, including the sole and exclusive right to prosecute this action and enforce the '155 Patent against infringers, and to collect damages for all relevant times.

70.     The '155 Patent generally describes wireless earphones that comprise a transceiver circuit for receiving streaming audio from a data source, such as a digital audio player or a computer, over a wireless network.

71.     The written description of the '155 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

72.     JLab has made, had made, used, imported, supplied, distributed, sold, and/or offered for sale products and/or systems, including systems in which its JLab-branded products and/or systems, including the Air Executive headphones, are incorporated ("Accused Headphones").

73.     As set forth in the attached non-limiting Claim chart (Exhibit F), JLab has infringed and is infringing at least Claim 1 of the '155 Patent by making, having made, using, importing, distributing, selling, and/or offering for sale the Accused Headphones.  In particular, the use of the Accused Headphones by JLab to, for example, demonstrate those products in brick-and-mortar stores in Austin, Texas or to, for example, test those products, constitute acts of direct infringement of Claim 1 of the '155 Patent.

74.     JLab actively induces infringement of at least Claim 1 of the '155 Patent by selling the Accused Headphones with instructions as to how to use the Accused Headphones in a system such as that recited in the '155 Patent.  JLab aids, instructs, or otherwise acts with the intent to cause an end user to use the Accused Headphones.  JLab knew of the '155 Patent and knew that its use and sale of the Accused Headphones infringe at least Claim 1 of the '155 Patent.

75.     JLab is also liable for contributory infringement of at least Claim 1 of the '155 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Accused Headphones, used to infringe Claim 1 of the '155 Patent. The Accused Headphones have no substantial non-infringing uses.  When an end user uses the Accused Headphones in combination with, for example, a smart phone such as, for example, an Apple iPhone and/or a peripheral device such as, for example, an Apple Watch, the end user directly infringes Claim 1 of the '155 Patent.  JLab knew that the Accused Headphones were especially made for use in an infringing manner prior to the filing of this lawsuit.  For at least the reasons set forth above, JLab contributes to the infringement of the '155 Patent by others.

76.     Koss has been damaged as a result of the infringing conduct by JLab alleged above. Thus, JLab is liable to Koss in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

77.     JLab's infringement of the '155 Patent has caused, and will continue to cause, Koss to suffer substantial and irreparable harm.

78.     JLab has been aware that it infringes the '155 Patent since at least July 13, 2020, upon the receipt of the letter attached as Exhibit I.  Since obtaining knowledge of its infringing activities, JLab has failed to cease its infringing activities.

79.     JLab's infringement of the '155 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Koss's rights under the patent.

80. Koss has complied with 35 U.S.C. § 287 with respect to the '155 Patent.

### THIRD CAUSE OF ACTION

### (Infringement of the '982 Patent)

81. Koss incorporates by reference and realleges each and every allegation of Paragraphs 1 through 80 as if set forth herein.

82. Koss owns all substantial rights, interest, and title in and to the '982 Patent, including the sole and exclusive right to prosecute this action and enforce the '982 Patent against infringers, and to collect damages for all relevant times.

83. The '982 Patent generally describes wireless earphones that comprise a transceiver circuit for receiving streaming audio from a data source, such as a digital audio player or a computer, over a wireless network.

84. The written description of the '982 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

85. JLab has made, had made, used, imported, supplied, distributed, sold, and/or offered for sale products and/or systems, including systems in which its JLab-branded products and/or systems, including the Air Executive headphones, are incorporated ("Accused Pods").

86. As set forth in the attached non-limiting Claim chart (Exhibit G), JLab has infringed and is infringing at least Claim 1 of the '982 Patent by making, having made, using, importing, distributing, selling, and/or offering for sale the Accused Pods. In particular, the use of the Accused Pods by JLab to, for example, demonstrate those products in brick-and-mortar stores in Austin, Texas or to, for example, test those products, constitute acts of direct infringement of Claim 1 of the '982 Patent.

87.     JLab actively induces infringement of at least Claim 1 of the '982 Patent by selling the Accused Pods with instructions as to how to use the Accused Pods in a system such as that recited in the '982 Patent.  JLab aids, instructs, or otherwise acts with the intent to cause an end user to use the Accused Pods.  JLab knew of the '982 Patent and knew that its use and sale of the Accused Pods infringe at least Claim 1 of the '982 Patent.

88.     JLab is also liable for contributory infringement of at least Claim 1 of the '982 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Accused Pods, used to infringe Claim 1 of the '982 Patent. The Accused Pods have no substantial non-infringing uses.  When an end user uses the Accused Pods in combination with, for example, a smart phone such as, for example, Apple iPhone and/or a peripheral devices such as, for example, an Apple Watch, the end user directly infringes Claim 1 of the '982 Patent.  JLab knew that the Accused Pods were especially made for use in an infringing manner prior to the filing of this lawsuit.  For at least the reasons set forth above, JLab contributes to the infringement of the '982 Patent by others.

89.     Koss has been damaged as a result of the infringing conduct by JLab alleged above.  Thus, JLab is liable to Koss in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

90.     JLab's infringement of the '982 Patent has caused, and will continue to cause, Koss to suffer substantial and irreparable harm.

91.     JLab has been aware that it infringes the '982 Patent since at least July 13, 2020, upon the receipt of the letter attached as Exhibit I.  Since obtaining knowledge of its infringing activities, JLab has failed to cease its infringing activities.

92.     JLab's infringement of the '982 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Koss's rights under the patent.

93.     Koss has complied with 35 U.S.C. § 287 with respect to the '982 Patent.

## FOURTH CAUSE OF ACTION

### (Infringement of the '325 Patent)

94.     Koss incorporates by reference and realleges each and every allegation of Paragraphs 1 through 93 as if set forth herein.

95.     Koss owns all substantial rights, interest, and title in and to the '325 Patent, including the sole and exclusive right to prosecute this action and enforce the '325 Patent against infringers, and to collect damages for all relevant times.

96.     The '325 Patent generally describes wireless earphones that comprise a transceiver circuit for receiving streaming audio from a data source, such as a digital audio player or a computer, over a wireless network.

97.     The written description of the '325 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

98.     JLab has made, had made, used, imported, supplied, distributed, sold, and/or offered for sale products and/or systems, including systems in which its JBud Epic and/or Jbud Airsport products and/or systems are incorporated ("Accused Hangers").

99.     As set forth in the attached non-limiting Claim chart (Exhibit H), JLab has infringed and is infringing at least Claim 1 of the '325 Patent by making, having made, using, importing, distributing, selling, and/or offering for sale the Accused Hangers.  In particular, the use of the Accused Hangers by JLab to, for example, demonstrate those products in brick-and-mortar stores in Austin, Texas or to, for example, test those products, constitute acts of direct infringement of Claim 1 of the '325 Patent.

100.     JLab actively induces infringement of at least Claim 1 of the '325 Patent by selling the Accused Hangers with instructions as to how to use the Accused Hangers in a system such as that recited in the '325 Patent.  JLab aids, instructs, or otherwise acts with the intent to cause an end user to use the Accused Hangers.  JLab knew of the '325 Patent and knew that its use and sale of the Accused Hangers infringe at least Claim 1 of the '325 Patent.

101.     JLab is also liable for contributory infringement of at least Claim 1 of the '325 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Accused Hangers, used to infringe Claim 1 of the '325 Patent. The Accused Hangers have no substantial non-infringing uses.  When an end user uses the Accused Hangers in combination with, for example, a smart phone such as, for example, an Apple iPhone and/or a peripheral devices such as, for example, an Apple Watch, the end user directly infringes Claim 1 of the '325 Patent.  JLab knew that the Accused Hangers were especially made for use in an infringing manner prior to the filing of this lawsuit.  For at least the reasons set forth above, JLab contributes to the infringement of the '325 Patent by others.

102.     Koss has been damaged as a result of the infringing conduct by JLab alleged above. Thus, JLab is liable to Koss in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

103.     JLab's infringement of the '325 Patent has caused, and will continue to cause, Koss to suffer substantial and irreparable harm.

104.     JLab has been aware that it infringes the '325 Patent since at least July 13, 2020, upon the receipt of the letter attached as Exhibit I.  Since obtaining knowledge of its infringing activities, JLab has failed to cease its infringing activities.

105.     JLab's infringement of the '325 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Koss's rights under the patent.

106.    Koss has complied with 35 U.S.C. § 287 with respect to the '325 Patent.

### JURY DEMAND

Koss hereby requests a trial by jury on all issues so triable by right.

### PRAYER FOR RELIEF

WHEREFORE, Koss requests that:

A.      The Court find that JLab has directly infringed the Patents-in-Suit and hold JLab liable for such infringement;

B.      The Court find that JLab has indirectly infringed the Patents-in-Suit by inducing its customers to directly infringe the Patents-in-Suit and hold JLab liable for such infringement;

C.      The Court find that JLab has indirectly infringed the Patents-in-Suit by contributing to JLab's customers' direct infringement of the Patents-in-Suit and hold JLab liable for such infringement;

D.      The Court award damages pursuant to 35 U.S.C. § 284 adequate to compensate Koss for JLab's past infringement of the Patents-in-Suit, including both pre- and post-judgment interest and costs as fixed by the Court;

E.      The Court increase the damages to be awarded to Koss by three times the amount found by the jury or assessed by the Court;

F.      The Court declare that this is an exceptional case entitling Koss to its reasonable attorneys' fees under 35 U.S.C. § 285; and

G.      The Court award such other relief as the Court may deem just and proper.

Dated: July 22, 2020

Respectfully submitted,

 /s/ *Darlene F. Ghavimi*
Darlene F. Ghavimi (TX Bar No. 24072114)
**K&L GATES LLP**
2801 Via Fortuna, Suite #350
Austin, TX 78746
Tel.: (512) 482-6919
Fax: (512) 482-6859
darlene.ghavimi@klgates.com

Benjamin E. Weed (*pro hac vice* to be filed)
Philip A. Kunz (*pro hac vice* to be filed)
Erik J. Halverson (*pro hac vice* to be filed)
Gina E. Johnson (*pro hac vice* to be filed)
**K&L GATES LLP**
Suite 3300
70 W. Madison Street
Chicago, IL 60602
Tel.: (312) 372-1121
Fax: (312) 827-8000
benjamin.weed@klgates.com
philip.kunz@klgates.com
erik.halverson@klgates.com
gina.johnson@klgates.com

Peter E. Soskin (*pro hac vice* to be filed)
**K&L GATES LLP**
Suite 1200
4 Embarcadero Center
San Francisco, CA 94111
Tel.: (415) 882-8046
Fax: (415) 882-8220
peter.soskin@klgates.com

**ATTORNEYS FOR PLAINTIFF**
**KOSS CORPORATION**

503322546 v4